UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| AG EQUIPMENT COMPANY, <br> and EDWARD T. KURTZ, in his <br> capacity as Trustee of the Suzanne <br> Ash Kurtz Revocable Trust, <br> <br>          Plaintiffs, <br> <br> v. <br> <br> AIG LIFE INSURANCE COMPANY, INC., <br> and MARK HEIDENREITER, <br> <br>          Defendants. | Case No. 07-CV-0556-CVE-PJC |

## OPINION AND ORDER

Now before the Court is Plaintiff AG Equipment Company's Motion for Partial Summary Judgment (Dkt. # 202). Plaintiff AG Equipment Company ("AG") requests summary judgment on its claim of breach of contract against defendant AIG Life Insurance Company, Inc. ("AIG"). AG also requests summary judgment on AIG's amended counterclaims against AG. For the foregoing reasons, AG's motion is denied in part and granted in part.

### I.

In an Opinion and Order dated January 21, 2008, the Court found the following undisputed facts, which are now incorporated herein:

AG provided its employees with medical insurance through a self-funded Medical Benefits Plan ("the Plan"). Beginning in May 2003, AG purchased stop-loss insurance coverage from AIG, and AG subsequently purchased stop-loss insurance from AIG each year through May 1, 2007. AG was directly responsible for paying the first $40,000 of healthcare costs incurred by covered

employees but, under the stop-loss Policy ("the Policy"), AG could seek payment of "eligible expenses" from AIG of excess amounts falling within the Policy and up to the Policy limits of $1 million per employee. The Policy defined eligible expenses as "the charges which are covered and paid under the Plan, subject to any limitations of this Policy." Dkt. # 200, Ex. 1, at 5. This definition did not change at any time while the Policy was in force. AIG used a third-party claims administrator, Mercer, to process claims under AG's policy.

AIG reviewed AG's Plan and agreed to provide stop-loss coverage based on the terms of the Plan. Id., Ex. 5, at 2. If AG intended to amend the Plan, it was required to send the amendments to AIG for review, and the amendments would not have any effect on payments issued under the Policy until the amendments were "reviewed and accepted" by AIG. Id. Under the Plan, a person is eligible for coverage if he or she:

> (1) is a Full-Time, Active Employee of the Employer. An Employee is considered to be Full-Time if he or she normally works at least 30 hours per week and is on the regular payroll of the Employer for that work.
>
> (2) is in a class eligible for coverage.
>
> (3) completes the employment Waiting Period of 60 consecutive days as an Active Employee. . . .

Id., Ex. 5, at 6. The Plan does not expressly distinguish between hourly and salaried employees and there is no provision of the Plan exempting salaried employees from the 30 hour per week requirement. At some point after this case was filed, AG amended the Plan to remove any reference to the 30 hour per week requirement for salaried employees. Id., Ex. 24, at 144.

In 2001, AG hired Suzanne Ash Kurtz, and she was employed by AG until 2007. AG asserts that Kurtz was hired as AG's in-house counsel, but AIG does not concede this fact.[1]  She earned $2,500 per month or $30,000 per year.  Id., Ex. 6, at 6-18.  Kurtz was the ex-wife of AG's CEO, Grady Ash, and she was a licensed attorney in the state of Oklahoma.  In late 2003, Kurtz became seriously ill and was diagnosed with Leiomyosarcoma, or MLS, in the connective tissue around her lungs.  She required several surgeries and hospital stays, and her medical expenses amounted to several hundred thousand dollars during the course of her treatment.  AG paid the bills pursuant to the Plan, and AG requested reimbursement from AIG for amounts covered by the Policy.

On April 24, 2007, Mercer received a telephone call from Mark Heidenreiter, a janitor for AG.  Id., Ex. 15.  Heidenreiter claimed that he found a folder of e-mails spanning several years in Ash's wastebasket and the e-mails suggested that Ash had colluded with Kurtz to defraud AIG.  Id., Ex. 14, at 6.  Specifically, he claimed that Ash put his ex-wife on the payroll for the purpose of providing her health benefits, but Kurtz did not actually work for AG.  Id. at 12.  Heidenreiter claimed that he kept the documents because he believed the e-mails might be "evidence that would need to be turned over to the authorities."  Id. at 6.  Heidenreiter's wife, Killeen Heidenreiter, was employed as the controller for AG until 2005,[2] and Heidenreiter claimed that his wife could corroborate his claims that Kurtz did not work at least 30 hours a week.  Id. at 8.  Heidenreiter sent

---

[1]   For the purpose of ruling on AG's motion for partial summary judgment, the Court will view the evidence in a light most favorable to the non-moving party.

[2]   Killeen Heidenreiter was not fired by AG.  However, she was receiving long-term disability benefits due to a medical condition and was no longer an active employee for AG.  Dkt. # 200, Ex. 21, at 1.

3

the documents to Mercer and claims that he did not keep a copy of any of the documents taken from Ash's office.

The documents consisted of numerous e-mails between Kurtz and Ash and several handwritten documents. Many of the initial e-mails concerned the formation of a tax-exempt foundation, the H.G. Ash Foundation, with funding from AG. On May 7, 2001, Kurtz sent an e-mail to Ash stating "Hey General . . . . how about 30 hours at minimum wage????  Help me figure out this insurance thing. oh, and is that 30 hours a week? or 30 hours a month? . . ." Id., Ex. 17, at 13. Ash responded on the same day and wrote:

> OK Sugar, let's do this.
>
> I will put you on our payroll as a full-time assistant to our controller, Killeen Heidenreiter. Your primary responsibility will be [sic] assist Killeen evolve our human resources objectives and document the plan.
>
> Your initial compensation will be $2,500/month with discretionary bonuses based on our perception of your contribution to our growth plan.
>
> We, of course, will not expect you to work unless you feel like doing so. Your work, [sic] can further be accomplished in the convenient atmosphere of your home surroundings.
>
> We will further consider your starting employment date to be 4/1/01, which will allow you and your dependents to enroll in our group health insurance program on 6/01/01.
>
> You will need to visit with Killeen before 6/01/01, and complete all of the enrollment documents. Her direct phone is 461-7305. She will be expecting your call for this purpose. For the time being let's keep our deal between [sic] the three of us. Secondly, it's nobody's business but ours anyway.
>
> Welcome to A G Equipment Sugar. We are excited about having you on our side.

Id., Ex. 17, at 14.

Earlier on April 24, 2007, AIG had sent a check to AG in the amount of $467,775.89, as payment for expenses submitted by AG for medical treatment received by Kurtz. AIG immediately stopped payment on the check and initiated an investigation into Heidenreiter's allegations that Kurtz was not actually working for AG. AIG's claims manager, Linda Subbiondo, referred the claim to AIG's investigative division, AIG-WIR, and Marie Bott was assigned to investigate the claim. Bott requested employment information from AIG, such as Kurtz's employment contract, I-9, and W-4. Dana Kurtz responded to Bott's request and informed Bott that she was an attorney representing AG in this matter. Bott determined that Kurtz was placed on AG's payroll in April or May 2001, but she could not determine how many hours per week Kurtz worked. She reviewed the e-mails produced by Heidenreiter and stated:

> It is clear that a major element of her compensation was the receipt of insurance benefits, and she repeatedly expressed her appreciation for the insurance benefit. I was not provided any documentation that gave any indication of how many hours she worked weekly. She did, however, give legal advice relating both to establishing a non-profit charitable trust to protect Mr. Ash's assets from estate taxes at his death and to AG Equipment's legal problems. At least some of the emails discussing legal matters were exchanged while Ms. Kurtz was undergoing chemotherapy. I am not aware of any reason to believe that the number of emails discussing legal advice provides a reliable indication of how often advice was given, because advice could also have been given orally or by paper correspondence.

Id., Ex. 21, at 2. Bott determined that Kurtz was performing some amount of legal work for AG but, as a non-attorney, she did not feel qualified to assess the number of hours that the work described in the e-mails might involve. Her conclusion was that the e-mails alone did "not establish one way or the other whether Ms. Kurtz worked enough to be considered a full time employee." Id. at 3. AIG hired an attorney to investigate AG's claim based on Bott's recommendation. Id., Ex. 18, at 6.

AG demanded immediate payment of the disputed claim and asserted that it had provided AIG all of the relevant information necessary to process the claim. Id., Ex. 22, at 2. AG claimed that Heidenreiter was a "disgruntled" former employee who was upset with Ash for placing Killeen Heidenreiter on disability, and alleged that Heidenreiter illegally accessed private documents on Ash's computer in an attempt to harm Ash and AG. Id. at 4. AIG informed AG that its claim for Kurtz's medical expenses was neither accepted nor denied, but the claim was pending while AIG conducted an investigation in Kurtz's employment status. Id. AIG also rejected AG's assertions that Heidenreiter was a disgruntled former employee. Id. AIG requested an examination under oath ("EUO") of Ash and Kurtz as part of its investigation. Id. at 5. AG refused to produce Ash or Kurtz for an EUO, because AG claimed that the Policy did not authorize AIG to take an EUO of any AIG employee.[3] Dkt. # 240, Ex. 2, at 6. AIG's attorney responded that, without the EUOs, "there is not much left to discuss as my client will not make this payment with the cloud of uncertainty that hangs over this claim . . . ." Dkt. # 200, Ex. 22, at 9.

After the parties were unable to reach an agreement, AG filed this lawsuit on September 7, 2007. When the lawsuit was filed, AIG had not formally denied AG's claim for Kurtz's medical expenses and AIG states that the claim was pending. During discovery, AIG requested examples of Kurtz's legal work to verify that Kurtz actually performed legal work for AG. Dkt. # 91. AG refused to produce Kurtz's work, and claimed that the documents were privileged. Dkt. # 115-2. However, AG produced a privilege log identifying legal work allegedly performed by Kurtz. Kurtz gave two depositions in this case. In her first deposition, Kurtz stated that she worked at least 30

---

[3] In his deposition, Ash testified that he would have voluntarily given AIG a sworn statement before this lawsuit was filed, regardless of the Policy language. Id., Ex. 25, at 2.

6

hours per week and sometimes as many as 60 hours per week. Id., Ex. 23, at 3. In her second deposition, she testified that other AG employees and executives could verify her claim that she worked at least 30 hours per week. Id., Ex. 24, at 5. Ash testified that he did not monitor the hours of salaried employees, but he felt that he was in a position "to make a judgment as to whether or not [Kurtz] had done 30 hours a week." Id., Ex. 25, at 3. He further testified that he believed all salaried employees worked more than 30 hours per week, but he did make any specific reference to Kurtz. Dkt. # 206, Ex. 15, at 64. Based on her observations as AG's former controller, Killeen Heidenreiter stated that Kurtz did not work 30 hours per week. Id., Ex. 27, at 11-12. Laura Lawrence, AG's current controller, testified that Kurtz was a salaried employee for AG, but she has no personal knowledge concerning the number of hours Kurtz worked. Id., Ex. 29, at 4. Lawrence stated that AG does not keep track of time for salaried employees and has no records that would conclusively prove AG's assertion that Kurtz worked at least 30 hours per week. Id. at 5.

The following additional undisputed facts were not found by the Court in its Opinion and Order on AIG's motion for summary judgment, but are relevant to this motion. First, under the Policy, a "covered unit" is defined as "an employee, an employee and his or her dependents, or such other defined unit as agreed upon in writing between the Company and the Policyholder." Dkt. # 206, Ex. 14.

A provision of the Plan that is relevant to this motion provides that AG is the Plan Administrator and, in that capacity, shall:

> "administer this Plan in accordance with its terms and establish its policies, interpretations, practices, and procedures. It is the express intent of this Plan that the Plan Administrator shall have maximum legal discretionary authority to construe and interpret the terms and provisions of the Plan, to make determinations regarding issues which relate to eligibility for benefits, to decide disputes which may arise relative to a Plan Participant's rights, and to decide questions of Plan interpretation

and those of fact relating to the Plan. The decisions of the Plan Administrator will
be final and binding on all interested parties . . . ."

Dkt. #202, Ex. 1, at 52. According to plaintiff, "AG administers the plan."[4] Id., at 7.

Finally, the term "normally," as it relates to the number of hours per week employees are required to work in order to be eligible for coverage, is not defined in the Plan. Id., at 9.

Fact discovery closed on October 31, 2008, and both AG and AIG filed motions for partial summary judgment (Dkt. ## 195, 202). On January 21, 2008, the Court granted in part and denied in part AIG's motion for summary judgment. Dkt. # 272. It was granted as to AG's bad faith claim and denied as to AG's breach of contract claim and AIG's counterclaims.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but

---

[4]  According to the deposition testimony of Laura Lawrence, Lawrence was designated as the "Plan Administrator." Dkt. # 260, Ex. 3, at 88-89. However, Lawrence states that she received help from Susan Sheldon, and that Sheldon and Ash may also have been designated as Plan Administrators. Id. The excerpted testimony does not shed light on whether any individual at AG was designated as Plan Administrator at the time Kurtz was determined to be eligible for coverage under the Plan.

8

rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

**III.**

AG moves for summary judgment on its claim against AIG for breach of contract. AG contends that the undisputed facts show Kurtz was a covered employee under the Plan, and AIG breached the contract by denying or pending AG's claim. AG argues the following in support of its motion for summary judgment on its breach of contract claim: Kurtz was a "covered unit" under the Policy; AG was entitled to interpret the Plan; AG's interpretation was reasonable; allowing AIG to control the interpretation of AG's Plan would lead to absurd results; and the doctrine of reasonable expectations should allow AG to recover regardless of whether it correctly interpreted

the Plan.[5] All of AG's arguments that AIG breached the contract are dependent upon interpretation of a perceived ambiguity in the contract.

As a general matter, breach of contract is a "material failure of performance of a duty arising under or imposed by agreement." Milroy v. Allstate Ins. Co., 151 P.3d 922, 926 (Okla. Civ. App. 2006) (citations omitted). To prevail on a claim for breach of contract, a party must prove three elements: (1) existence of a contract; (2) breach of that contract; (3) actual damages suffered as a result of the breach. Oltman Homes Inc. v. Mirkes, 190 P.3d 1182, 1186 (Okla. Civ. App. 2008) (citations omitted). Under Oklahoma law, an insurance contract should be construed according to the terms set out within the four corners of the document. First American Kickapoo Operations, L.L.C. v. Multimedia Games, Inc., 412 F.3d 1166, 1173 (10th Cir. 2005); Redcorn v. State Farm Fire & Cas. Co., 55 P.3d 1017, 1020 (Okla. 2002); London v. Farmers Ins. Co., Inc., 63 P.3d 552, 554 (Okla. Civ. App. 2002). If the terms of the contract are "unambiguous, clear and consistent, they are to be accepted in their ordinary sense and enforced to carry out the expressed intention of the parties." Roads West, Inc. v. Austin, 91 P.3d 81, 88 (Okla. Civ. App. 2004). A court should not create an ambiguity in the policy by "using a forced or strained construction, by taking a provision out of context, or by narrowly focusing on a provision." Wynn v. Avemco Ins. Co., 963 P.2d 572,

---

[5]   AG also argues that AIG violated Oklahoma insurance law, and the violation is evidence of breach of contract. Dkt. # 202, at 32. Oklahoma law provides that a "clean claim" must be paid within forty five (45) days. See OKLA. STAT. tit. 36, § 1219. A "clean claim" is defined as a "claim that has no defect or impropriety, including a lack of any required substantiating documentation, or particular circumstances requiring special treatment that impedes prompt payment . . . ." Id. at § 1219(B)(2). The Court previously ruled that even if § 1219 applies here, it applies only to "clean claims." See Dkt. # 272, at 15 n. 11. As this claim falls far short of the definition of clean claim provided by statute, compliance or non-compliance with the requirements of § 1219 does not provide a basis for summary judgment in favor of AG.

575 (Okla. 1998). A policy term will be considered ambiguous only if it susceptible to more than one reasonable interpretation. Max True Plastering Co. v. U.S. Fidelity & Guar. Co., 912 P.2d 861, 869 (Okla. 1996). If an insurance contract contains an ambiguous term, the Court may refer to extrinsic evidence to interpret the insurance policy. Gable, Simmons & Co. v. Kerr-McGee Corp., 175 F.3d 762, 767 (10th Cir. 1999) (citing Pierce Couch Hendrickson Baysinger & Green v. Freede, 936 P.2d 906, 912 (Okla. 1997)). When construing an ambiguous term in an insurance contract, a court must consider "not what the drafter intended . . . but what a reasonable person in the position of the insured would have understood [the ambiguous provision] to mean." American Economy Ins. Co. v. Bogdahn, 89 P.3d 1051, 1054 (Okla. 2004).

**A.     Kurtz as a Covered Unit Under the Policy**

First, AG argues that Kurtz was a "covered unit" under the Policy because she was "an employee, an employee and his or her dependents, or such other defined unit as agreed upon in writing between [AIG] and [AG]." Dkt. # 202, at 23. AG contends that the Policy language is broader than the Plan language, and because Kurtz was an "employee," she was entitled to coverage. However, AIG disputes AG's contentions and argues that the parties never agreed to a definition of "employee" other than the one in the Plan.[6] Dkt. # 260, at 5. Plaintiff's argument would render the Plan's definition of covered employee a nullity. Under AG's argument, AIG would be required to pay losses for someone not eligible for benefits under the Plan, so long as that individual was an "employee." The Court finds that the Plan and the Policy must be read together, such that only

---

[6]     The Plan provides that one is eligible for coverage if he/she is "a Full-Time, Active Employee of the Employer. An Employee is considered to be Full-Time if he or she normally works at least 30 hours per week and is on the regular payroll of the Employer for that work." Dkt. # 202, Ex. 1, at 52.

11

employees eligible for benefits under the Plan are covered by the Policy. The parties clearly intended that only losses covered by the Plan would be eligible for reimbursement under the Policy; any other interpretation of the Policy and the Plan is nonsensical.

Accordingly, the relevant issue is whether Kurtz was eligible for coverage under the Plan, and consequently, whether AIG was obligated to pay AG for Kurtz's medical expenses under the Policy. In the Opinion and Order on AIG's motion for summary judgment (Dkt. #272), the Court found that a genuine issue of material fact precludes summary judgment because the parties have presented conflicting evidence concerning Kurtz's eligibility under the Plan.[7] Because the Plan and Policy must be read together, an employee must be eligible for benefits under the Plan in order to be deemed a "covered unit" under the Policy. The Court finds that AG's argument is without merit.

**B.     Interpretation of the Plan**

AG next argues that the Court should find that AIG was obligated to defer to AG's interpretation of the Plan under the Tenth Circuit's holding in Zurich North America v. Matrix, 426 F.3d 1281 (10th Cir. 2005). According to AG, because the Plan was an ERISA self-funded plan, the Court must review AG's determination of Kurtz's eligibility under the "arbitrary and capricious"

---

[7]     In her deposition, Kurtz testified that she generally worked 30 hours per week and sometimes up to 60 hours per week. Dkt. # 200, Ex. 23, at 3. However, Ash and Lawrence testified that AG did not keep track of time for salaried employees and there are no time sheets or payroll records to verify Kurtz's assertion. Id., Ex. 25, at 3; Id., Ex. 29, at 5. Ash's deposition testimony also suggests that, as a salaried employee, Kurtz did not need to work 30 hours per week. Killeen Heidenreiter testified in her deposition that Kurtz did not work 30 hours per week. Id., Ex. 27, at 11-12.

12

standard.[8]  See Dkt. # 202, at 20.  However, ERISA is relevant here only to the extent that AG, as Plan Administrator, had the legal authority to interpret any ambiguous language in the Plan.  AG also relies on Zurich to argue that it was rightfully entitled to interpret the Plan and, thus, AIG breached the contract by not deferring to AG's determination of eligibility.  In Zurich, like here, Zurich was the provider of stop-loss insurance coverage to Matrix.  Id. at 1284.  The Tenth Circuit upheld the district court's grant of summary judgment to Matrix, holding that the Matrix plan provided that Matrix had the sole discretion to interpret the terms of its plan and determine eligibility of its employees.  Id. at 1288-89.  Matrix designated a "Health Benefit Committee" that was responsible for interpreting the plan's terms if they were ambiguous.  Id. at 1287-88.  According to the Matrix plan, an employee who was laid off at the end of a project would have his coverage terminated unless were to commence work on another project within 21 days.  Id. at 1287.  An issue arose where Zurich questioned whether one of Matrix's employees should have been entitled to benefits under the Matrix plan because he was on a hiatus of longer than 21 days between projects.  Id.  The Health Benefit Committee met and determined that the employee was eligible, giving a detailed explanation of its interpretation of the Matrix plan.  Id. at 1288.

Here, the Plan plainly states that AG had the "maximum legal discretionary authority" to interpret any ambiguous language in the Plan.  Dkt. #202, Ex. 1, at 52.  Under the Plan, employees who "normally work 30 hours per week" are entitled to benefits, but the term "normally" is not

---

[8]  AG cites Zurich in support of its argument that the Plan is a "self-funded ERISA Plan," and accordingly, the Court should apply the "arbitrary and capricious" standard.  Dkt. # 202, at 20.  However, the Tenth Circuit made it clear that the ERISA standard was not the standard used by the district court in Zurich to grant summary judgment.  See id. at 1287 n. 7 ("The district court did mention ERISA, but only incidentally.  It is clear from the order that the district court applied the appropriate Fed. R. Civ. P. 56 standard throughout.").  The Court reminds counsel to accurately represent the cases it relies upon.

defined. See Dkt. # 200, Ex. 5, at 6. Accordingly, there is the potential for some ambiguity in the Plan language that would arguably require interpretation. The Plan indicates that AG will have a "Plan Administrator" who is permitted to interpret contract language, and AG contends that "AG" is the Plan Administrator. See Dkt. # 202, at 7. The record on summary judgment, however, is silent as to the process used, if any, by the AG Plan Administrator to interpret Plan language. Perhaps more significantly, there is nothing in the record to suggest that the Plan language was interpreted and a determination was made with respect to Kurtz's employment and eligibility.[9] In short, there is no indication that AG ever exercised its discretion to interpret the Plan language. While Zurich is directly on point, without more evidence, this Court cannot rely on Zurich to grant summary judgment. Accordingly, AG is not entitled to summary judgment on the grounds that AIG's failure to defer to AG's interpretation of the Plan constituted a breach of contract. For the same reason, AG is not entitled summary judgment on the basis of its argument that its determination that Kurtz was eligible was reasonable.[10]

### C. Doctrine of Reasonable Expectations

AG argues that, even if it is not entitled to summary judgement on other grounds, it should be granted summary judgment on its breach of contract claim on the basis of the doctrine of

---

[9] The only evidence in the record to suggest that AG ever intended to "interpret" the Plan was Ash's e-mail to Kurtz telling her not to worry about insurance coverage. Dkt. # 200, Ex. 17, at 14. This e-mail is insufficient to show a formal exercise of discretion and, in fact, may demonstrate an abuse of discretion.

[10] AG also argues that allowing AIG control over the interpretation of the Plan would lead to an absurd result. AIG did not interfere with AG's authority to interpret the Plan. Rather, AIG requested more information about the eligibility of one of AG's employees. There is nothing "absurd" about that request, and it does not reflect an impermissible attempt to assert control over AG's discretionary authority.

reasonable expectations. Under this doctrine, "the meaning of the language is not what the drafter intended it to mean, but what a reasonable person in the position of the insured would have understood it to mean." Hall v. Cherokee Nation, 162 P.3d 979 (Okla. Civ. App. 2007). The doctrine of reasonable expectations is applied as an "interpretive tool to discern the intent of the parties." Squirrel v. Bordertown Bingo, 125 P.3d 680, 684 (Okla. Civ. App. 2005) (citing Bogdahn, 89 P.3d at 1054). The doctrine of reasonable expectations may be applied only when: "(1) the challenged policy language is ambiguous, or (2) an exclusion within the policy is (a) masked by technical or obscure language, or (b) hidden in a policy's provisions." Max True Plastering Co. v. USF & G, 912 P.2d 861, 870 (Okla. 1996). The test for ambiguity is whether the language 'is susceptible to two interpretations on its face . . . from the standpoint of a reasonably prudent lay person, not from that of a lawyer." Hall, 162 P.3d at 984 (citation omitted).

The doctrine of reasonable expectations does not apply here for several reasons. First, plaintiff argues that the "normally work 30 hours" language is the ambiguity. However, that language is in the Plan and the Plan was not drafted by AIG, but rather by AG. Thus, an ambiguity, if one exists, would not automatically be construed in AG's favor. Even if the Court were to construe ambiguity in AG's favor, any reasonable interpretation of "normally work 30 hours" would have required that Kurtz must have performed real work for a sufficient number of hours in order to be eligible for coverage. Second, the language is neither hidden nor obscure or technical language. Because there is a genuine issue of material fact as to how much Kurtz worked, the doctrine of reasonable expectations does not apply here. AG is not entitled to summary judgment on the basis of the doctrine of reasonable expectations.

## IV.

Finally, plaintiff moves for summary judgment on AIG's counterclaims.[11]

### A.     AIG's Breach of Contract Counterclaim

The Court has already denied AIG's motion for summary judgment on its breach of contract counterclaim. See Opinion and Order, Dkt. # 272, at 11. For the same reasons, AG's motion for summary judgment on AIG's breach of contract counterclaim is denied.

### B.     Fraudulent Misrepresentation/Deceit

AG moves for summary judgement on AIG's fraud claim, arguing that there is no evidence of fraud. Under Oklahoma law, actual fraud may be defined as "the suggestion, as a fact, of that which is not true, by one who does not believe it to be true," with intent to deceive another party to a contract. OKLA. STAT. tit. 15, § 58. Fraud may also be defined as "the suppression of that which is true, by one having knowledge or belief of the fact." Id. To prevail on a claim for fraud under Oklahoma law, a party is required to demonstrate: (1) a material false representation, (2) made with knowledge of its falsity, or recklessly made without knowledge of its truth, and as a positive assertion, (3) with the intention that it be relied upon by another, and (4) reliance thereon by another to his injury. Olson v. Briscoe, 10 P.3d 246, 249 (Okla. 2000).

Here, AIG specifically proceeds on the theory of fraudulent misrepresentation or deceit. To prevail on a claim for fraudulent misrepresentation or deceit, a party must allege that (1) the non-moving party made a material misrepresentation; (2) that it was false; (3) the non-moving party

---

[11]    AG moves for summary judgment on AIG's counterclaims for "fraudulent concealment" and "conversion." However, the Court previously dismissed those claims. Dkt. # 117.

made the representation knowing it was false or in reckless disregard of the truth; (4) that the non-moving party made it with the intention that it should be acted upon by the moving party; (5) that the moving party acted in reliance upon it; and (6) that moving party thereby suffered injury. Sturgeon v. Retherford Publications, Inc., 987 P.2d 1218, 1228 (Okla. Civ. App. 1999).

AIG alleges that AG's representations regarding Kurtz's eligibility for coverage were false, made with the knowledge of their falsity, and AIG relied upon those representations. However, AIG does not allege that it relied upon AG's representations of Kurtz's eligibility when it issued the Policy. Rather, AIG claims that it relied upon AG's representations that Kurtz was covered under the Plan when it made payments to AG for Kurtz's medical expenses. There are genuine issues of material fact as to whether AG falsely represented that Kurtz was eligible for coverage under the Plan and, if so, whether the false representation was made knowingly or in reckless disregard of the truth. Accordingly, AG is not entitled to summary judgment on AIG's fraud claim.

**C.     AIG's Counterclaims for Equitable Relief**

AG also moves for summary judgment on AIG's counterclaims for unjust enrichment and money had and received. These claims arise where one party fails to return money that, in equity and good conscience, it should not be allowed to retain. See Harvell v. Goodyear Tire and Rubber Co., 164 P.3d 1028, 1035 (Okla. 2006); Clay v. Independent School Dist. No. 1 of Tulsa Cty., 935 P.2d 294, 301 n. 11 (Okla. 1997); French Energy Inc. v. Alexander, 818 P.2d 1234, 1237 (Okla. 1991). Where the plaintiff has an adequate remedy at law, the court will not ordinarily exercise its equitable jurisdiction to grant relief. Harvell, 164 P.3d at 1035. Nonetheless, a party may allege an equitable claim as an alternative to a contract-based claim so long as the party is not permitted double recovery on the same injury. See Burlington Northern and Santa Fe Ry. Co. v. Grant, 505

F. 3d 1015, 1030 (10th Cir. 2007) (citing N.C. Corff P'ship, Ltd. v. Oxy USA, Inc., 929 P.2d 288, 295 (Okla. Civ. App. 1996)). Here, there is a contract between the parties and one party will recover on its breach of contract claim. Accordingly, there is an adequate remedy at law. AG is granted summary judgment on AIG's counterclaims for equitable relief.

**D.     Punitive Damages and Attorney's Fees[12]**

AG was not granted summary judgment on AIG's counterclaim for fraud. Because AIG has a claim for fraud, punitive damages may be available. See OKLA. STAT. tit. 23, § 9.1. Summary judgment for AG is denied as to AIG's request for punitive damages.

**IT IS THEREFORE ORDERED** that Plaintiff AG Equipment Company's Motion for Partial Summary Judgment (Dkt. # 202) is **denied** in part and **granted** in part: it is **denied** as to AG's breach of contract claim, AIG's counterclaim for fraud, and AIG's request for punitive damages; it is **granted** as to AIG's counterclaims for unjust enrichment and money had and received.

**DATED** this 28th day of January, 2009.

*Claire V. Eagan*
CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[12]     With respect to attorney's fees, as previously noted by the Court, pursuant to Local Rule 54.2, a prevailing party with a statutory, contractual, and/or legal basis for attorney fees must file a motion and brief to seek such recovery. See Dkt. # 170. AG's motion for summary judgment on AIG's prayer for attorney fees is premature and need not be addressed.